# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| KAREN O'CONNER | CIVIL ACTION |
|---|---|
| v. | NO. 15-5051 |
| THE PNC FINANCIAL SERVICES GROUP, INC. AND AFFILIATES LONG-TERM DISABILITY PLAN | |

## MEMORANDUM RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

**Baylson, J.**                                                              **November 13, 2017**

As an employee at PNC Bank, National Association ("PNC"), Plaintiff Karen O'Conner ("Ms. O'Conner") participated in the PNC Financial Services Group, Inc. and Affiliates Long-Term Disability Plan, which is the Defendant in this action (the "Plan"). [1] In 2014, Ms. O'Conner sought long-term disability ("LTD") benefits under the Plan due to Crohn's Disease, Diabetes, Hypertension, depression, and knee and back pain. After conducting a review of her medical history, which included reviews by five independent physicians, PNC's claim administrator, Liberty Life Assurance Company of Boston ("Liberty"), concluded that Ms. O'Conner was not disabled pursuant to the terms of the Plan.

After unsuccessfully appealing the decision to Liberty, Ms. O'Conner filed this lawsuit for a declaratory judgment pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA") by a beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C § 1132(a)(1)(B). Presently before the Court are the parties' cross-motions for summary judgment.

---

[1] The Court will refer to the LTD Benefits Summary Plan Description documents (AR 1353-73) as the "Plan documents" for ease of reference.

1

## II. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Prior to her last day of work on April 25, 2014, Ms. O'Conner had worked at PNC Bank since 1977. (Administrative Record ("AR"), ECF 22 at 85). In a questionnaire she provided to Liberty, she reported that she had worked for PNC in three capacities: as a "Business Banker, Relationship Manager" from January 1977 to August 2008; as "Underwriting I" from August 2008 to August 2013, and as a "Financial Statement Collector" from August 2013 to April 25, 2014. (Id.) She found her job "very stressful." (Id.). Ms. O'Conner suffered from joint and back pain, Crohn's Disease, Irritable Bowel Syndrome, diabetes, hypertension, and depression. When asked to describe what prevented her from engaging in "any gainful employment," she listed "uncontrollable diarrhea, stomach cramping, and pain. Severe knee, leg and foot pain. Difficult to stand, walk, or sit for long periods of time. Diabetic and pressure issues with stress. Trouble with focusing and multitasking." (AR 84).

As a PNC employee, Ms. O'Conner participated in the Plan, which is governed by ERISA. (AR 1372-73). The Plan provides full-time, salaried employees who are out of work for longer than 91 days (the "Elimination Period") with LTD benefits of up to 60% of the employee's pre-disability compensation, or up to 70% with employee contribution. (AR 1358). The Plan is fully self-funded, as defined in ERISA. (AR 1434). Benefits pursuant to the Plan are paid out of a separate trust, the Group Benefits Trust, established by PNC solely for that purpose. (Id.). The Plan documents provide that court review of decisions is limited to whether the decision was arbitrary and capricious. (AR 1368).

The Plan documents define long-term disability and the "Elimination Period":

*Definition of LTD*
For disabilities that extend beyond 91 consecutive calendar days and are considered long term, the definition of disability is as follows:

- For the first 24 months (from the date LTD benefits begin): you are disabled if your disability makes you unable to perform the material or essential duties of your own occupation as it is normally performed in the national economy…

The claims administrator determines whether your disability meets these definitions.

*Elimination Period*
You can begin receiving LTD benefits after you have been totally disabled due to an injury or illness for 91 consecutive days...This is called the elimination period.

(AR 1357). LTD benefits may be denied where the claimant fails to submit proof of disability upon request. (AR 1364). As a condition under the Plan, a claimant "may be required to submit whatever proof the Plan Administrator may require (either directly to the Plan Administrator or to any person delegated by it)." (AR 1371).

In order to evaluate Ms. O'Conner's claim for LTD benefits, Liberty sent letters to physicians with whom she met regarding her symptoms: Dr. Linda Good, Ms. O'Conner's primary care physician (AR 49-50), and Dr. Michael Cavanaugh, orthopaedic specialist (AR 52-53). Liberty asked these physicians to submit Ms. O'Conner's medical records for purposes of evaluating her LTD eligibility. (AR 49-53). Liberty also sent a letter to Ms. O'Conner, requesting that she provide all medical information necessary to evaluate her eligibility and to demonstrate that she suffers from a disability as defined in the Plan. (AR 56-57). In this letter, Liberty informed Ms. O'Conner that if the requested information was not provided it would make an eligibility determination based on the information available in its file. (AR 57). Liberty informed her in a separate letter that because Ms. O'Conner had not been working since April 26, 2014, her LTD Elimination Period would be satisfied on July 25, 2014. (AR 44).

In order to determine whether Ms. O'Conner could still do her job, Liberty asked PNC for a job description of the "Underwriter I" position, which PNC provided (AR 69-70). A

3

vocational specialist engaged by Liberty considered the Underwriter I position to correspond to the job of "Loan Review Analyst," an occupation defined by the Dictionary of Occupational Titles as "requiring a sedentary physical demand," in addition to "occasional reaching, handling, and fingering." (AR 242-43). The vocational specialist further found that the occupation required "constant sitting." (AR 244).

By letter dated December 30, 2014, Liberty informed Ms. O'Conner that she was not entitled to LTD benefits under the Plan. (AR 418-22). Liberty indicated that it considered medical documentation submitted in support of the claim from: Dr. Good, family practice; Dr. Cavanaugh, orthopaedics; Dr. Marie Bailey, gastroenterology; Dr. Michael Franklin, rheumatology; Dr. Gregory Pharo, pain management; and Carol Campbell, Ed.D, therapist. (AR 419-20). The letter stated that, "[b]ased on the available medical information, independent physician reviews and vocational review, occupational impairment from any condition is not supported. Thus, you do not meet your Plan's definition of disability, and we must deny your claim." (AR 421).

On June 1, 2015, Ms. O'Conner appealed Liberty's denial of her request for benefits. (AR 406-16). She submitted several hundred pages of new medical documentation in conjunction with her appeal, (AR 406-845), including an affidavit from Ms. O'Conner in which she described her "spinal and leg problem" and stated that, while at work, "[o]n several occasions I nearly had accidents, or had partial accidents trying to get to the bathroom on time." (AR 768). The original file and the additional documentation were sent to a further three specialists: gastroenterologist Dr. Thomas Liebermann, pain specialist Dr. Philippe Chemaly, Jr., and psychiatrist Dr. Peter Sugerman (AR 1301-29). Dr. Liebermann found that "the claimant may have a mild form of inflammatory bowel disease and possibly irritable bowel syndrome that

should not interfere with her work-related activities and that she should have ready access to restroom facilities at work." (AR 1307). Dr. Sugerman found, after speaking with Ms. O'Conner's therapist, that "[t]he evidence does not support the presence of functional impairment due to depression…specifically, detailed mental health information is not provided that would document a range of clinically significant symptoms to support a DSM-IV diagnosis of depression and the severity of the symptoms, including frequency, intensity or duration." (AR 1308). Dr. Chemaly did find impairments, however, and recommended the following restrictions and limitations:

> Allowance for symptom relieving position breaks every hour from a seated position every hour for 5 to 10 minutes. Sitting is limited to 6 hours in an 8 hour day. Walking and standing would be up to 2 hours in an 8 hour day, however not consecutive with allowance for symptom relieving position breaks for 5 to 10 minutes every half hour.

(AR 1310).

In an August 30, 2015 letter to Ms. O'Conner's counsel, Liberty summarized the information in the appeal file and stated its decision to uphold the denial of Ms. O'Conner's LTD benefits. (AR 1334-42). The letter stated that Liberty "conclude[s], based on a review of all of the medical documentation contained [in] Karen O'Conner's disability claim file, there is insufficient medical and psychiatric evidence to establish that Ms. O'Conner's conditions are of a nature and severity that prevent Ms. O'Conner from performing the material and substantial duties of her . . . occupation." (AR 1341). "Therefore," Liberty determined, "Ms. O'Conner did not meet the definition of disability, as defined in [the Plan], throughout the Elimination Period and continuously thereafter, and no benefits will be paid." (Id.).

Ms. O'Conner filed this lawsuit on September 8, 2015 against Liberty. (Compl., ECF 1). On November 11, 2016, Ms. O'Conner filed her Amended Complaint, naming the Plan as the

5

only defendant. (Am. Compl., ECF 6). Ms. O'Conner's only claim for relief is a declaratory judgment specifying, among other things, that she is disabled as defined in the Plan, and that Defendant is obligated to pay continuing LTD benefits pursuant to the Plan, plus interest. (Id. at 6-7). Ms. O'Conner's motion to remand and for limited discovery was denied on May 20, 2016 (Order Denying Pl.'s Motion for Remand, ECF 25). In March 2017, the parties cross-moved for summary judgment. (Parties Cross-Mot. for Summ. J, ECF 34, 35).

The Court subsequently requested that Ms. O'Conner file a counterstatement of facts and a response to the PNC's motion for summary judgment, and that both parties file supplemental briefs addressing two issues: (1) Third Circuit precedent on how the Court should consider the opinions of treating providers relative to other evidence in the disability determination process and (2) Ms. O'Conner's position immediately prior to leaving work. (Order Requesting Suppl. Briefing, ECF 38). In a subsequent filing, Ms. O'Conner asserted that she was "not challenging the Plan's determination that Plaintiff's occupation was Underwriter, as per the DOT" when she ceased working, although her "job duties changed somewhat in August 2013." (Pl.'s Suppl. Br., ECF 41 at 4).

## II. LEGAL STANDARDS

### A. ERISA Standard of Review

In its previous memorandum denying Ms. O'Conner's motion to remand, the Court decided that Ms. O'Conner's case was subject to an arbitrary and capricious standard (Mem. in Support of Order Denying Mot. for Remand, ECF 24). The Court relied on the language of the Plan documents, which granted the administrator discretionary authority to make benefits determinations to find that "an 'arbitrary and capricious' standard applie[d]." (Id. at 9). The Third Circuit has recently reiterated that, "[u]nder a traditional arbitrary and capricious review, a

court can overturn the decision of the plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." Doroshow v. Hartford Life & Accident Ins. Co., 574 F.3d 230, 234 (3d Cir. 2009). Furthermore, "[t]he scope of this review is narrow, and 'the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.'" Id. (quoting Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)). Finally, when deciding whether an administrator's determination is without reason, unsupported by the evidence, or erroneous as a matter of law, courts must "apply the following rules of construction of contracts to ERISA plans: the plan must be considered as a whole; straightforward, unambiguous language should be given its natural meaning; and, if a specific provision found in the plan conflicts with a general provision, the specific provision should control." Saltzman v. Independence Blue Cross, 384 Fed. App'x 107, 114 (3d Cir. 2010).

### B. Summary Judgment Standard

Summary judgment is proper only when there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding whether summary judgment is warranted, a court must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Felker v. USW Local 10-901, 697 F. App'x 746, 749 (3d Cir. 2017). On cross-motions for summary judgment, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." Marciniak v. Prudential Fin. Ins. Co. of Am., 184 F. App'x 266, 270 (3d Cir. 2006).

### III. DISCUSSION

Because an arbitrary and capricious standard governs, the decision of the Plan administrator may be overturned only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011). Ms. O'Conner argues only that the decision to deny benefits was unsupported by substantial evidence. PNC argues that Ms. O'Conner failed to bear her burden of showing that the denial was without reason, unsupported by substantial evidence, or legally erroneous. The Court will address the parties' motions in turn.

**A. Ms. O'Conner's Motion**

Much of Ms. O'Conner's brief to this Court consists of a long factual recitation recounting her extensive treatment for her various medical issues, each of which culminates in a conclusory statement to the effect that her symptoms preclude her from doing her job. Often Ms. O'Conner takes liberties with the factual record; for example, in the section regarding her gastrointestinal symptoms, she writes, "It appeared from this [physician's] note that 'de-stressing' at night gave Ms. O'Conner relief from the abdominal pain." (Pl.'s Mem. in Support of Summ. J., ECF 34 at 14). This assertion is simply not supported by the administrative record. (AR 766). Earlier in her brief, she asserted, entirely without citation to the record, that her "continuous feelings of grief, anger, hopelessness and frustration clearly would affect her ability engage [sic] in meaningful and effective relationships with customers, co-workers and supervisors in any occupational setting." (Id. at 16). With regard to her orthopedic issues, she argued that she needed aids to walk and that sitting provided only transient relief; pain would deprive her of the "persistence and pace to maintain employment in any setting, let alone the job of Loan Review Analyst." (Id. at 14).

8

Ms. O'Conner argues that the decision to deny her benefits was "against the substantial evidence" as she chose to present it. However, even had she not cherrypicked from and distorted the record, the record is hardly so unambiguous as she would have the Court believe. Her gastroenterologist described her Crohn's and IBS as "quiescent" on April 21, 2015. (AR 766). She did not start seeing her therapist until August 11, 2014—after the Elimination Period had elapsed on July 25, 2014. (AR 773). A note from Dr. Good, Ms. O'Conner's internist, requests that Ms. O'Conner be excused from work because she was "being treated for depression related to her medical illnesses." (AR 500). Dr. Good's appointment notes from April 17, 2014 and June 18, 2014 state that Ms. O'Conner "[d]enied sadness or anhedonia in the past 2 weeks." (AR 490, 502). Dr. Good also found Ms. O'Conner to be "Independent with all ADL's" (i.e., activities of daily living) on July 19, 2014. (AR 155). And as PNC notes, she did not mention her depression either in the forms she submitted to Liberty on July 7, 2014 (AR 84-85) or in the affidavit dated April 8, 2015 filed along with her appeal to Liberty (AR 768). (ECF 44, Def.'s Reply Br. in Support of Summ J. at 5).

In the "legal argument" section of her memorandum in support of summary judgment, which does not cite a single case, Ms. O'Conner contends that the denial of benefits was not supported by substantial evidence. In particular, she takes issue with the opinions of two consulting physicians: Dr. Sugerman, the psychiatrist, and Dr. Chemaly, the pain management specialist.

Ms. O'Conner assails Dr. Chemaly's conclusion that that she could work, subject to some restrictions:

> Allowance for symptom relieving position breaks every hour from a seated position every hour for 5 to 10 minutes. Sitting is limited to 6 hours in an 8 hour day. Walking and standing would be up to 2 hours in an 8 hour day, however not

9

> consecutive with allowance for symptom relieving position breaks for 5 to 10 minutes every half hour.

(AR 1310). Her argument that these restrictions preclude her from performing a job that requires "constant sitting" breaks down, as PNC notes, when "constant" is given its technical meaning. Section IV of Appendix C to the Dictionary of Occupational Titles defines "constantly" as "activity or condition exists 2/3 or more of the time."[2] See also Van Arsdel v. Liberty Life Assurance Co. of Boston, No. CV 14-2579, 2017 WL 1177174, at *13 n.17 (E.D. Pa. Mar. 30, 2017). Dr. Chemaly found her to be able to sit 6 hours out of an 8 hour day, or 3/4 of the time, thus meeting the definition of "constant sitting."[3] She then asserts, without any citation to medical evidence in the record, that the adaptive devices identified by Liberty's vocational expert, such as "telescoping [computer] monitor holder/stands," (AR 1349) would not provide relief from "the pain that would affect her stamina and concentration." (Pl.'s Mem. in Support of Summ. J., ECF 34 at 20). Moreover, as noted above, her argument that Dr. Chemaly incorrectly found that she was independent with all activities of daily living fails because her own doctor had found the exact same thing. (AR 155). Finally, her attempt to argue that she suffered from cognitively impairing side effects from her medications is simply not supported by the record.

She next disputes Dr. Sugerman's conclusion that her depression was not impairing as "disingenuous" because her treating provider, whom she started seeing only several months after leaving PNC, allegedly thought otherwise. (Pl.'s Mem. in Support of Summ. J., ECF 34 at 22). Ms. O'Conner points to a letter written by her therapist, Carol Campbell, stating that "[Ms. O'Conner] is being treated for major depression…She cannot function at work at this time." (AR

---

[2] Appendix C: Components of the Definition Trailer - DOT Dictionary of Occupational Titles, https://occupationalinfo.org/appendxc_1.html#STRENGTH (last visited Oct. 5, 2017).
[3] She also attempts, creatively, to argue that breaks of up to ten minutes per hour while sitting and up to ten minutes per half-hour while walking or standing mean that she would be off-task half of the day. The numbers simply do not add up.

778). She also takes issue with Dr. Sugerman's characterization of the therapy as occurring "approximately monthly," which is accurate for the period from January to April 2015, but understates the frequency of therapy between August and December 2014, when Ms. O'Conner saw her therapist on some ten occasions. In her view, therefore, Dr. Sugerman was incorrect that the therapy was "not considered intensive"; however, she takes this statement out of context: the level of therapy Ms. O'Conner documented in the file, in his view, "would not be consistent with a level of care required for a severe and impairing mental condition." (AR 1313). Noting that the depression "ha[d] been rated as mild by Dr. Good on several occasions," Dr. Sugerman opined that the record lacked "detailed mental health information…that would document a range of clinically significant symptoms to support a DSM-IV diagnosis of depression and the severity of the symptoms, including frequency, intensity, or duration," and went on at some length about the sorts of symptoms "that are more reliably recognized as impairing, such as suicidal or homicidal ideation," among many others. (AR 1308-09).

In her supplemental brief, Ms. O'Conner objects to Dr. Sugerman's failure to acknowledge or the therapist's statement, sent in response to Dr. Sugerman's summary of their telephone call, that "[she thought] the depressive symptoms would <u>also</u> preclude employment." (AR 1332) (emphasis original).[4] The questionnaire Dr. Sugerman was to fill out makes clear that he was to "describe Ms. O'Conner's psychiatric symptoms, conditions, and any associated impairment(s), for the period 4/28/14 through 7/27/14, and from 7/28/14 forward." (AR 1312). Ms. Campbell, who began seeing Ms. O'Conner only on August 11, 2014, could not speak to the initial 91-day elimination period after her leaving PNC. (AR 773).

---

[4] Ms. O'Conner points out for the first time in her supplemental brief that although Dr. Sugerman purportedly gave her therapist five business days on July 31, 2015 to respond to his summary of the conversation, he did not wait for Ms. Campbell's response (received on August 6, 2015) to prepare the final report, dated August 3, 2015. (AR 1299-1314, 1331-32). Concerning though that may be, that does not change the fact that Ms. Campbell did not start treating Ms. O'Conner until some three and a half months after Ms. O'Conner left PNC.

Under ERISA, treating providers are not entitled to deference over other evidence, such as the opinions of a consulting physician, in a plan's disability determination process. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003). Black & Decker explained that although plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," reviewing courts "have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician" or to "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id. at 834. Following Black & Decker, the Third Circuit has held that the opinions of consulting physicians, even those who do not examine the patient, may constitute evidence sufficient to uphold a plan's denial of benefits under an arbitrary and capricious standard. See Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250, 258 (3d Cir. 2004); Young v. Am. Int'l Life Assur. Co. of New York, 357 F. App'x 464 (3d Cir. 2009). Stratton explained that a "professional disagreement" between consulting physicians and treating providers "does not amount to an arbitrary refusal to credit." 363 F.3d at 258.

At best, Ms. O'Conner has shown a disagreement between her therapist and Dr. Sugerman, which, under Black & Decker and Stratton, her provider is not necessarily entitled to win. This is particularly so because her therapist did not start treating her until nearly three and a half months after she left PNC—after the 91-day "elimination period" established by the Plan documents. Similarly, Ms. O'Conner may believe her pain symptoms to be more serious than Dr. Chemaly did, but that alone does give the Court grounds to find that the benefits denial was arbitrary and capricious. In her supplemental brief, Ms. O'Conner that "[a]s a public policy matter, Plaintiff argues that plan administrators should accord a great amount of deference to

Plaintiff's treating physicians" because treating providers know their patients and are not paid by the plan administrator (Pl.'s Suppl. Br., ECF 41 at 3) (emphasis added). She does not, however, identify any binding Third Circuit precedent that would lead this Court to find, in light of Black & Decker and Stratton, that the denial of benefits was arbitrary and capricious.[5]

Ms. O'Conner is therefore not entitled to summary judgment, or to the declaratory relief and monetary award of benefits she seeks.

**B. PNC's motion**

PNC not only opposes Ms. O'Conner's motion for summary judgment argues that it is entitled to summary judgment. PNC argues in its motion that the decision to deny Ms. O'Conner's benefits was not arbitrary and capricious because Ms. O'Conner has failed to show that it was "without reason, unsupported by substantial evidence or erroneous as a matter of law," and accordingly, PNC is entitled to summary judgment. (Def.'s Mem. in Support of Summ. J., ECF 35-1 at 9). Ultimately, the Court must decide whether, despite viewing the facts and drawing all inferences in Ms. O'Conner's favor, no reasonable finder of fact could conclude that the denial of benefits was arbitrary and capricious.

Touting the robustness of its review process, PNC asserts that Liberty placed the burden of proving disability on Ms. O'Conner, and she simply did not meet it. (Id. at 8-9). On the basis of much of the information presented above, PNC defends the denial of benefits as supported by substantial evidence, especially since Ms. O'Conner's own evidence, it asserts, "did not unequivocally support her claim," such as the fact that Ms. O'Conner's Crohn's Disease was not active in July 2014. (Id. at 3). Even if the Court draws all inferences in Ms. O'Conner's favor,

---

[5] In her supplemental brief, Ms. O'Conner cites a number of district court employing a more exacting standard of review, but these cases employing a "sliding scale" are no longer good law in the wake of Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008). See Estate of Schwing v. The Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009) (holding that the Third Circuit's "'sliding scale' approach is no longer valid" post-Glenn).

that is a not unfair characterization of the record. The opinions of the treating providers were the substantial evidence Liberty needed to deny Ms. O'Conner's claim.

In her counter-statement of facts, Ms. O'Conner essentially concedes that the Plan documents required her to submit documentation of disability and show disability throughout the elimination period. (Pl.'s Counter-Statement of Facts, ECF 40 at ¶¶ 9-10). She nonetheless seeks to defeat PNC's motion for summary judgment by complaining that Liberty did not adequately defer to the statements of Dr. Campbell. This argument fails for the reasons discussed above. She also complains that the report of a second vocational expert used by Liberty in its denial neither appeared in the record nor was made available to her counsel. PNC replies that no formal report was prepared, and it relied on the conclusions of Jason Miller set forth in the record at AR 2-3, where indeed they appear. A formal report might have been helpful to Ms. O'Conner's counsel, but his failure to notice this entry in the event log does not, alone, allow this Court to conclude that the denial was arbitrary and capricious.[6]

PNC has shown that the denial of benefits was not "without reason, unsupported by substantial evidence or erroneous as a matter of law" so as to render its decision arbitrary and capricious. See Doroshow, 574 F.3d at 234. It is therefore entitled to summary judgment.

### IV. CONCLUSION

The Court **GRANTS** the Plan's motion for summary judgment and **DENIES** Ms. O'Conner's cross-motion for summary judgment. An appropriate order follows.

O:\CIVIL 15\15-5051 O'conner v PNC Fin. Servs. Grp\15-5051 MSJ Memorandum 11132017.docx

---

[6] Ms. O'Conner also claims defense counsel misrepresented the administrative regarding which treating provider(s) stated that she should be released from work, and defense counsel claims in a reply brief to having made such statements based on a misreading of the "Attending Physician's Statement of Work Capacity and Impairment" at AR 23-24, in which Dr. Good wrote that Ms. O'Conner should stay home from work starting 4/28/14. However, there does not appear to be any basis to infer that Liberty interpreted the "Attending Physician's Statement" in the same way that defense counsel initially did, or that such an interpretation affected its disability determination.